## Case No. 12,352.

### The SARAH STARR.

### The AIGBURTH.

[Blatchf. Pr. Cas. 69.] [1]

District Court, S. D. New York. Nov., 1861.[2]

PRIZE — LAWFUL MEANS OF WAR — BLOCKADE — ENEMY PROPERTY — DOMICILE OF OWNER—NEUTRALS — CONFISCATION — CLEARANCE PAPERS ISSUED BY ENEMY.

1. The hostilities commenced against the United States by the seceded states have produced a state of war between the two communities, as consequent to which the United States are authorized to employ against their enemies the means of resistance and attack, by land or naval forces, which are justifiable under the law of nations.

2. A blockade of the ports of their enemy is one of such lawful means, and is incident to the war power, and may be imposed by the president flagrante bello, without any act of the legislature declaring it.

3. Property belonging to a neutral who is domiciled and carrying on trade at an enemy port is enemy property. Traffic with the enemy is forbidden by public law. A sale of property during hostilities in an enemy port, by a person domiciled and trading there, to a neutral, does not pass the title, and the property still remains subject to capture as prize.

4. A neutral domiciled and trading in a belligerent port can neither hold title to property acquired there during the war, nor confer it upon others, against the interests imparted by capture at sea to the adversary belligerent.

5. There is nothing in the treaties of November 19, 1794 (8 Stat. 116), December 24, 1814 (Id. 218), and July 3, 1815 (Id. 228), between the United States and Great Britain, which gives to a British merchant, resident in a port of the seceded states during the war, an immunity from the general principles of public law applicable to resident neutral merchants.

6. The act of July 3, 1861 (12 Stat. 255), does not restrict the war powers of the United States. The confiscations provided for by the 6th section of that act, and by the act of August 6, 1861 (Id. 319), can be carried into effect by the prize courts of the United States, as respects property captured at sea.

7. The fact that a vessel carries clearance papers issued by the enemy, does not constitute, of itself, justifiable cause for her capture.

8. To constitute a blockade of a port, an adequate force must be stationed to render the entrance or departure of vessels into or from the port dangerous.

9. Further proof allowed to be given by the libellants on the question of violation of blockade.

10. Vessels and cargoes condemned as enemy property.

In admiralty.

BETTS, District Judge. No facts brought into discussion in the first suit, or in that against the schooner Aigburth, heard concurrently with it, are made subjects of controversy, other than those relating to the existence and efficacy of the blockade of the ports of Wilmington or Newbern, or other

ports of the Atlantic coast south of Cape Henry, at the times the captures were made. Both vessels and cargoes were seized and libelled by the libellants as enemy property, and also for having committed, or attempted to commit, a violation of the blockade of the above ports. The vessels are claimed as the property of Cowlan Gravely, a subject of the queen of Great Britain, and a neutral in the pending war between the Southern or Confederate States and the United States. Various rights and titles to the cargoes of the respective vessels are set up, and sought to be maintained by the proofs given on the hearing of the causes. The facts in relation to the acts of the two vessels and the cargoes shipped on board were substantially these:

The brig Sarah Starr, with her cargo, was arrested by the United States ship-of-war Wabash, twenty-five or thirty miles from the bar at Cape Fear river, on the 3d of August last, the day she left port from Wilmington, in North Carolina, bound to Liverpool. The schooner Aigburth was arrested forty miles off the coast of Florida, opposite Fernandina, by the United States ship-of-war Falmouth, on the 31st of August last, bound from Matanzas, Cuba, to New Brunswick, Nova Scotia. Gravely claimed to be sole owner of the two vessels, and to be also the sole owner of the cargo of the Aigburth, and interested in that of the Sarah Starr; he asserting his sole ownership of one-fourth part thereof. The Aigburth was laden at the port of Newbern, North Carolina, in the month of July last, with cargo the product of that country, and sailed from Hatteras Inlet the 28th day of July aforesaid on a voyage to Cuba, and back to a port in the United States or British provinces. The formal paper titles in proof are sufficient, prima facie, to vest the ownership of two vessels in Gravely, the claimant.

It appears, from the register of the Sarah Starr, granted at Newport, Rhode Island, December 21, 1859, that the vessel was owned in equal one-third parts, by Charles B. Eddy, of Fall River, Massachusetts, William J. Munro, of Charleston, South Carolina, and George C. Munro, of Newport, Rhode Island; that she was named the Sarah Starr, of Charleston; and that a permanent register was issued to the owners at the port of Charleston, South Carolina, June 17, 1859. On the 10th of May, 1861, two of the above part owners conveyed their entire two-thirds interest in the vessel for the consideration of $100 to their co-owner, George C. Munro, who, on the first day of July thereafter, describing himself to be of Wilmington, state of North Carolina, by bill of sale, with warranty, sold and conveyed the vessel by the name of the Sarah Starr, of Charleston, South Carolina, to the claimant, Cowlan Gravely, for the consideration of $10,000; and duly acknowledged such conveyance, upon the same day, before a notary public at Wilmington. The claimant was then a British subject, resident at Charleston, and carrying on a business at that place as a merchant. The consideration

[1] [Reported by Samuel Blatchford, Esq.]

[2] [The Aigburth affirmed in Case No. 106. The Sarah Starr affirmed in part and reversed in part in Id. 12,353.]

money was to be paid, $3,000 in cash, for which a note of the purchaser, at a short credit, was accepted, the "residue out of the freight to be earned by the brig upon her arrival at Liverpool," to which port she was to be forthwith dispatched with a cargo. The personal responsibility of the claimant, and the freight money to be earned, was asserted in the bill of sale to be adequate security for the purchase-money, and, for that reason, that no lien or incumbrance on the vessel, by mortgage or other express pledge, was reserved. On his examination, on the 19th of August last, in preparatorio, George C. Munro testified that no portion of the consideration money had been paid by the purchaser to the vendor. The agent of the claimant, however, states, in an affidavit made on the 11th of September, 1861, before the British consul in Charleston, outside the suit, that the note had been paid since its execution. Gravely alleges, in his claim and answer, that, as between him and George C. and William J. Munro, he has rights in one-fourth of the cargo, and, generally, that he is owner of the brig and interested in her cargo.

The brig was laden with naval stores, the products of that region of country, consisting, upon the manifest, of spirits of turpentine, resin, crude turpentine, and beeswax, all claimed by the two Munros, (except fifty barrels laden by Thomas Evans). The personal residence of Eddy and William J. Munro still remains as it was when they assigned the vessel to their co-owner, George C. Munro; and that of Evans was at Wilmington, North Carolina. George C. Munro was born in the state of Rhode Island, and is married, and a householder in Newport, in that state, where his wife and family reside; but he and his brother have carried on trade and mercantile business in copartnership for four or five years past in and from Wilmington, North Carolina, and Charleston, South Carolina, by remaining in those states superintending and conducting such business personally, during the healthy season of the year, and returning thence and remaining, with their families, in Rhode Island, through other portions of the year. George C. Munro was in Wilmington, so transacting the business of the firm, before and at the time the cargo in question was purchased and laden on board the Sarah Starr, and he came out of that port with the cargo in this suit, and as a passenger to Liverpool on this vessel. The two Munros claim that part of the cargo as joint owners. George C. Munro was examined on the standing interrogatories in the cause as such passenger; and both claimants set up the same facts in their test affidavits appended to their claims, and accepted by the libellants as evidence in the suit.

On or about the 23d of July last, the claimant George C. Munro heard a rumor at Wilmington that a vessel-of-war of the United States had notified the officer in command of the Confederate fort at the mouth of the port that it was blockaded by the United States, and the vessels therein had fifteen days from the time of its blockade to depart thence with their cargoes. The Munros knew, before the sale of the vessel to Gravely, that war existed between North Carolina and the United States, but George C. Munro testifies that he did not know that the port was blockaded in fact.

The schooner Charlotte Anne, of North Carolina, was owned by James E. Howland, of that state, and Stephen D. Doar, of South Carolina, and, on the 8th of July, 1861, was sold and conveyed by them, for the consideration of $2,500, to the same Cowlan Gravely, of Charleston, South Carolina, who took possession of her as his own property, and had her laden at Newbern, North Carolina, with a cargo of produce purchased there, to go thence to Cuba, and back to a port in the United States or British provinces. She proceeded to sea on the 28th of July, then under the name of Aigburth; made her outward voyage to Cuba, and, returning thence, when off Fernandina, on the coast of Florida, was captured, on the 31st of August last, by a ship-of-war of the United States, and was sent to this port with a prize crew, and libelled in this court on the 13th of September as prize of war. The only claim interposed to this vessel and cargo is that put in on part of Gravely.

It remains equivocal, upon the evidence, whether any other consideration, on the purchase of the Sarah Starr, passed from her claimant Gravely to Munro than his promissory note for $3,000 on a term of credit, and bills of exchange drawn by him on her freight, or whether a payment of any sum whatever has been made on such alleged sale; as George C. Munro, on his examination in preparatorio, denies having knowledge of it, and the payment is only averred generally in an ex parte affidavit made by an agent of Gravely two months or more subsequent to the sale. The purchase money on the sale of the Aigburth to the claimant is receipted in full to him by the venders on the day of sale. No proofs are before the court of other titles to the cargoes in either vessel than what is asserted in the claims of the Munros, Eddy, and the claimant Gravely.

Some of the cardinal propositions of law upon which these suits and defences depend are involved in other actions which have already been passed upon by this court, and are now on review in the supreme court upon appeal. The conclusions embraced in those decisions declared by this court will, accordingly, be maintained until they shall be changed by the judgment of the supreme court.

The hostilities commenced upon the United States by the seceded or Confederate States of the South have produced a state of war between the two communities, as consequent

to which the United States are authorized to employ against their enemies the means of resistance and attack which are justifiable under the law of nations, by land or naval forces. A blockade of the ports of their enemy is one of such lawful means, and is incident to the war power, and may be imposed by the president flagrante bello, without any act of the legislature declaring it (The Rolla, 6 C. Rob. Adm. 364; 3 Phillim. Int. Law, p. 383, § 288); a blockade and a siege being equivalent acts for a like object, that of the reduction of an enemy by force of arms (Wheat. Hist. Law Nat. 137, 138; Wheat. Int. Law, 539, 540).

Both of these vessels and their cargoes, so far as claimed, were enemy property within the principles of public law. The sale of the Sarah Starr was negotiated and made by George C. Munro, when he was a merchant trading in an enemy port, to Gravely, also domiciled and carrying on trade in such place. That sale was unlawful as to Munro, even if, as he contends, he was then a resident of a loyal state, because it was in fraud of his obligations and duties towards his own government. Traffic with the enemy was forbidden by public law. Deponceau, War, 24; Chit. Law Nat. 1; 1 Kent, Comm. 66. The cargo claimed by the Munros was purchased in a like port, and consisted of enemy products. The remainder of the cargo, shipped by Evans, was obtained at the same place, and he was also a resident there. If Gravely had an interest in any of the cargo, it is not proved that he had acquired a vested property, or more than an optional privilege to take it on its arrival at Liverpool; and at all events, it must have been obtained, if any vested interest passed, through purchase or trade, from George C. Munro, a domiciled dealer in the enemy country at the time, and, as such, himself an enemy. Westl. Priv. Int. Law, 101; Law Lib. p. 49. The property would not pass out of Munro by such sale, and it remained, notwithstanding, liable to seizure in transitu at sea. The vessel is confiscable, because, in the eye of the law, business intercourse with an enemy, inconsistent with actual hostility, is equivalent to trading with such enemy. The Rapid, 8 Cranch [12 U. S.] 162, 163. These reasons all concur to bring the present case within the doctrine laid down in the antecedent decisions, that loyal citizens or neutrals who trade with an enemy, or have a mercantile domicile in an enemy country, are regarded, in the prize courts, in their commercial dealings and transactions there, as enemies, in relation to vessels and cargoes owned by them and captured at sea.

With respect to George C. Munro, the direct vender of the vessel, and the purchaser, in North Carolina, of the cargo claimed by him and his partner, and to Gravely, who claims the vessel, each had, indubitably, a trading or mercantile domicile in the enemy's country, at the period of the transaction in question, and other and further than in the special occurrence of the sale of this vessel and the lading of cargo on her for the voyage in question. William J. Munro was, likewise, a resident in the Confederate States for commercial purposes, both partners, apparently, upon the proofs, having their sole business domicile, in carrying on their copartnership operations, for a period of years prior to the insurrection and since, within those states. According to a brief but comprehensive summary of the law of prize relative to inhabitancies of that character, drawn up by Judge Story, with ample support of authority from the ancient and modern books, "persons who reside in a foreign country for purposes of trade are deemed inhabitants of that country by foreign nations, and the character of each changes with that of his country; in peace he is deemed a neutral, in war an enemy; and his property is dealt with accordingly in prize courts." 4 Am. & Eng. Enc. Law, Append. 615, art. "Domicile." Thus, in Hogsheads of Sugar v. Boyle, 9 Cranch [13 U. S.] 191, the supreme court decided, in a prize case, that the claimant, a neutral, by his actual residence in Denmark, yet had a national character of trade by means of his relationship to the procurement of the cargo captured, which was shipped from an enemy port; and the cargo was, accordingly, condemned.

Furthermore, the sale of the Sarah Starr by Munro to Grady was, under the proofs, manifestly colorable, and resorted to for the purpose of enabling the Munros, under that cover, to ship their property from an enemy country to a neutral market, in avoidance of the rules of public law which inhibit such commerce to either belligerent. 3 Phillim. Int. Law, p. 603, § 484, and notes. That offence on the part of the Munros, if their true residence and citizenship was, at the time, out of the Confederate States, and in Rhode Island, subjected the property to seizure and confiscation. The cases are unequivocal to this proposition, coming from an early source in English jurisprudence, and fully confirmed in the American courts.

The Bernon, 1 C. Rob. Adm. 102, was the case of a vessel purchased in France, during the war with England, by an American then resident in France. Sir William Scott regarded those circumstances as so suspicious that he required clear proof of the bona fides of the dealing, and that the vessel was not to be employed to the advantage of an enemy, and, for want of such evidence, he condemned the vessel. A series of decisions reiterated the doctrine, before the same judge, and applied it rigidly to American neutrals, under varying phases of facts, all upholding the principle that a residence by a trading person, for commercial purposes, in an enemy country, constitutes a domicile, imparting a national character to the residence, although it be fluctuating and temporary in its duration, and quasi incorporeal

and not personal. The Harmony, 2 C. Rob. Adm. 322; The Indian Chief, 3 C. Rob. Adm. 17; The Dree Gebroeders, 4 C. Rob. Adm. 233; The Danous, Id. 255, note 2; The Diana, 5 C. Rob. Adm. 60; The President, Id. 277. Many of the cases proceed upon the recognition of the doctrine, "that commerce by a citizen or subject with an enemy, is a criminal transaction, on the common principle that it is illegal in any person owing an allegiance, though temporary, to trade with the public enemy." These doctrines are maintained by the successors of that eminent jurist in the English prize court, and applied with undiminished vigor in cases of dealing and trade in ships and merchandise, equally in cases directly preceding the commencement of hostilities and in transactions during actual war; and no distinction is made, in their application, between domiciled neutrals and natural subjects. The Abo, Spinks, Prize Cas. 42; The Johanna Emilie, Id. 16; The Ernst Merck, Id. 98; The Christine, Id. 82. So, if a neutral makes purchase of a vessel in an enemy country, just prior to the breaking out of war, the bona fides of the transaction must be made out by indisputable proof, in order to protect her from capture (The Rapid, Id. 80), particularly when the purchase has been made upon the personal credit of the buyer, to be satisfied on the arrival of the vessel in the neutral country (The Christine, Id. 82); and the onus of proving the actual payment of the consideration money is in such case laid on the claimant (The Ernst Merck, Id. 101). A sale of a vessel to a neutral, flagrante bello, leaving a portion of the purchase money charged upon the vessel, or unpaid by the vendee, leaves the property in the belligerent, and subject to condemnation in a prize court, as enemy property. The Baltica, Id. 273, 274. The American authorities are equally explicit, that a neutral, even enjoying the privileges of consul, domiciled and trading in a belligerent country, is, in war, deemed a belligerent, and his acts are clothed with the character of one of its subjects; and he can neither hold title to property acquired in such country during war, nor confer it upon others, against the interests imparted, by capture at sea, to adversary belligerents. The Venus, 8 Cranch [12 U. S.] 253; Hogsheads of Sugar v. Boyle, 9 Cranch [13 U. S.] 191; The Ann Green [Case No. 414]; The San Jose Indians [Id. 12,322]; The Mary & Susan, 1 Wheat. [14 U. S.] 54, note f; 1 Kent, Comm. 72, 75; Wheat. Int. Law, c. 1, § 17. See, also, Mann. Law Nat. 7.

So far, then, as the proofs disclose the actual facts attending the acquisition of the cargo placed on board the Sarah Starr in North Carolina, it was wholly the property of the Munros, acquired by them there jointly during the war, and is lawful prize of war on both considerations,—that they purchased it in the enemy country, and that they, at the same time, had a commercial

domicile there. The vessel, on general principles, is placed in the same predicament. It was sold to Gravely, all parties being disqualified by their relations to this country to sell or purchase in a belligerent state, for the purpose of covering property from the operations of the law of war; and the transaction thus became, between them, one in fraud of the United States.

These observations apply equally to the title set up by Gravely to the schooner Aigburth. She was sold to him by resident enemies, and he acquired her and loaded her for foreign trade whilst he was a domiciled trader in the enemy country; and his position as a neutral was evidently employed as a cover to an illegitimate trade. The cases above cited stamp such a procedure as a fraud upon the belligerent rights of the United States and as constituting good cause of forfeiture of the vessel, and of the property on board of her, owned by him. His being a native British subject affords no protection against these consequences. He was mixed personally, and in his responsibilities, with the people with whom he maintained a commercial domicile. In his claim he represents himself to be of "England, merchant, but temporarily residing in Charleston, and a subject of her Brittannic majesty, and being the true and lawful and sole owner of the said schooner, her tackle, apparel, and furniture, and also owner of all the cargo on board said vessel." No other claim is interposed to the cargo, than that of Gravely, and the bills of lading, noting the cargo as shipped to its owners, and being indorsed in blank, import the ownership of the cargo to be according to the claim.

The papers taken with the vessel show that the transaction of the outward cargo and the return one was made through the intermediation of the house of Fraser & Co., of Charleston, as agents of the claimant; and thus far the outside evidence supports the claim of ownership of this claimant in the cargo captured, because a prize court regards merchandise to be the property of the shipper or consignor, and not of the consignee, unless there be clear proof to the contrary. The Abo, Spinks. Prize Cas. 42. Certainly this will be the rule when no other supposed owner litigates the right of property. The return cargo, then, simply as enemy property, is liable to arrest at sea as prize, whether its destination be to the enemy port, or to one in a neutral and friendly country. No distinction is marked, in the cases, between the liability of property taken at sea, owned by a neutral who is stamped with the character of an enemy by his commercial residence and dealing in the enemy's country, and the native residents thereof. Dr. Lushington comments upon the character of a neutral commercially domiciled in an enemy country in these terms: "There is no principle, I apprehend, so well laid down, no principle so generally true, as this: that whatever country a gentleman may belong to,

if he is resident in and carries on trade for a period of time in another country, he must be taken, for the purpose of trade, to belong to that other country, and not to his original domicile." The Johanna' Emilie, Id. 16. That vessel was owned by Rucker, a neutral, and the Hanoverian consul, resident in Riga, and was sold by his authority at Newcastle, and purchased by another Hanoverian, previous to a declaration of war; but the court held her to belong to Rucker, who, by his domicile, was an enemy, and condemned her as good prize.

It appears to me, therefore, in view of the rules of law applicable to the question, that the claimant Gravely, in the character of a neutral and a British subject by birth, was, within the purview of the public law, in her mercantile relations, an enemy of the United States at the time the two above-named vessels were captured; and that they, together with so much of their respective cargoes as belonged to him, are lawful prizes. The manifest principle of that jurisprudence divests the man acting in promotion of the interests of one belligerent, in its commercial, military, or fiscal operations, of all protection against the other, under the shield of foreign birth or allegiance, and stamps him with the character of the party whose ends his conduct subserves; and his planting himself as a resident within the dominions of an enemy, and there carrying on a traffic in vessels or merchandise tending to the benefit of the belligerent with whom he is domiciled, constitutes him an enemy of the other, and renders his property so acquired or used just prize of war.

A ground of defence and immunity in behalf of his claimant is, however, interposed, which, it is contended, gives him pre-eminent protection in both these suits. It is that by the treaty regulations between the British government and the United States, of November 19, 1794 (8 Stat. 116), the contingency in this case is provided for and remedied. The provision in that treaty is as follows (page 128): "If at any time a rupture should take place between his majesty and the United States, the merchants and others of each of the two nations residing in the dominions of the other shall have the privilege of remaining, and continuing their trade, so long as they behave peaceably, and commit no offence against the laws." The further terms of the stipulation do not come in question, as the government has not assumed to direct the removal of the claimant from its dominions by any express order or mandate. Other articles in that treaty and the subsequent ones of December 24, 1814, and July 3, 1815 (8 Stat. 218, 228), stipulate mutually the privilege to merchants to come and depart on their business freely from the territories of each nation. These arrangements are also insisted upon as securing to the claimant an entire immunity in every port of the United States as a resident British merchant. The material stipulations above quoted form the main basis of the argument. They are, in terms, framed to meet cases of hostilities existing between the contracting powers themselves, and no way look to disturbances in places not governed by their respective laws. The dominions to which the treaties refer, in reason, must be territories subject to the control and regulations of the respective parties; for it is not to be intended that nations, any more than individuals, assume to stipulate in their compacts, in respect to individuals' privileges against natural or physical impossibilities.

It is not only matter of notoriety, but the fact is verified by the official proclamation of the president of the United States, that, at the time the transactions occurred on the part of the claimant within these states, both of them were in open insurrection and revolt against the government and laws of the United States, and were united with the Confederate States of the South in flagrant war against the United States and its government. The territories of the two were occupied by armed forces, naval and military, in their service; and the authorities of the United States and its laws were arrested and resisted, and could not be enforced by the civil power of the government. The seceded states assumed, by their public acts and declarations, to be a government independent of the constitution and laws of the United States, and were endeavoring to maintain such independency by public hostilities and organized war. These incidents were notorious in North and South Carolina, and it is in proof in these suits that such condition of hostilities and public war on the part of those states was well known to the claimant. It must, accordingly, be presumed that he voluntarily continued his commercial domicile in that locality; and it is, moreover, to be implied from these proofs that the purchase of the vessels and shipment of the cargoes in question were negotiated and made with the claimant under full knowledge of those facts, as well as that the United States had declared the ports of these states to be in a state of belligerent blockade. He is legally chargeable, under such circumstances, with knowledge that he had lost by his domicile there the character of a neutral, and become a portion of the enemy population, as well as that he had thus placed himself, and continued voluntarily, outside of territories then under the authority or dominion of the United States. He was as a citizen of the United States would be who should have taken a commercial residence in an Irish port, and there carried on his trade, knowing that such kingdom had revolted against Great Britain, and, by force of arms, prevented the home government regaining possession and control of her former dominion therein. The British authorities would, unquestionably, regard the claim of an American citizen, under the terms of the treaty, in such case, as rescinded, or suspended, so long

as the place of residence continued to be forcibly wrested by hostile power from the actual authority of the mother government by acts of open war.

It seems to follow, plainly, from these considerations, that the exemption argued by the claimant, in his capacity as a British subject, and under the provisions of the treaties referred to, affords no protection to him in either of these suits. The privilege he sets up under the 26th article of the treaty of 1794 is outside of the casus fœderis, which relates solely to the existence of mutual hostilities between Great Britain and the United States. The other stipulations in the respective treaties referred to are limited to a reciprocal liberty of commerce between the two nations and their subjects, and impart nothing beyond the mutual enjoyment, within the laws and territories of each, of the rights of peaceful intercourse and trade between two neutral and friendly communities. The compacts afford no shadow of color to the merchants of either party to disrobe themselves of their neutrality towards the other whilst enjoying such residence, and to employ themselves in the service and aid of belligerent powers who are carrying on hostilities against the one whose guarantee of free domicile is invoked. The treaties, in words, grant the reciprocal privileges of residence and commerce, "subject always to the laws and statutes of the two countries respectively." 8 Stat. 124, art. 14; Id. 228, art. 1. The natural sense of the arrangements would be regarded as conveying no higher advantage or immunities to alien friends than native subjects and citizens possess within the territories of the contracting parties. The alien friend clearly could not, under the reservation expressed in the treaties, carry on a trade interdicted by the local law. He could not smuggle cargoes, or engage in the slave trade, or fit out or arm, within the country, vessels-of-war against friendly nations. The public law inhibits alike native citizens and friendly neutrals there domiciled from trading with the enemies of their own country, or with a friendly belligerent, in ports of such enemies, and from affording them aid or comfort there. 3 Phillim. Int. Law, c. 6. §§ 68, 74, 85; The Hoop, 1 C. Rob. Adm. 196.

The grounds of defence considered and passed upon in previous decisions in this court will also govern in these suits. The seceded states and their inhabitants, during the prosecution of the war by them, are regarded as enemies of the United States, and neither in relation to the doctrines of public law nor the relevancy of municipal regulations are they now within territories under the dominion of the laws of the United States. The right of sovereignty in the general government continues unaffected over the seceded states, although it may fail in being enforced, except according to the rights of war, while the interruption of the powers of the civil magistracy shall continue.

A bar is also raised on the argument by the claimants to the jurisdiction of the court in these suits, because of the provisions of the act of congress passed July 13, 1861 (12 Stat. 255). It is insisted that this statute supersedes the rules of national law, and constitutes the sole law which supplies authority to the government to seize vessels or property belonging to insurgents in the seceding or Confederate States, and that, by just implication it also establishes the doctrine that no power to arrest or confiscate such property is possessed by government except under the provisions of that act.

In the judgments of the court heretofore rendered in the various prize cases, and now under review before the supreme court, it was held, in effect, that the war subsisting between the United States and the Confederate States entitled the United States, under the rule of the law of nations, to prosecute it with all the authority and means lawful to be employed in a war between nations foreign to each other, and that the act of congress above cited did not rescind or curtail that authority in respect to the inhabitants or property of the enemy state. Those judgments do not, in terms, cover the objections made in both of these suits, as the Sarah Starr was captured before the provisions of the law went into effect. She was taken on the 3d of August, and the president's proclamation to give full effect to the statute was issued on the 16th of the month; and therefore, if the notice given by the proclamation of the president was necessary to render commercial intercourse attempted to be carried on by this vessel or her owners unlawful, and subject her and her cargo to forfeiture, a legal cause of arrest and condemnation would not be furnished at the time she was seized. But, in my opinion, the law in question was not intended to restrict or interfere with the war powers of the government. Its main purpose, disclosed by its title, is to provide for the collection of duties, and the other "purposes" will naturally be such as assimilate with or aid in effecting that end. U. S. v. Fisher, 2 Cranch [6 U. S.] 386; Beard v. Rowan, 9 Pet. [50 U. S.] 301; 1 Kent, Comm. 461. The first four sections of the act relate to securing duties on foreign commerce; the seventh section authorizes the president to employ other vessels than revenue cutters in enforcing the revenue laws; the eighth section places petitions for remission or mitigation of penalties or forfeiture under the like discretion of the secretary of the treasury as is given in the act of March 3, 1797 [1 Stat. 506]; the ninth section enlarges the jurisdiction of the United States courts over proceedings for forfeiture as to places where the proceedings therefor may be instituted; the fifth and sixth sections designate the subjects of forfeiture and the places where seizures may be made. Thus the scope and manifest purpose of these enactments aim to break up commercial intercourse by and between loyal citizens and insurgents; and to cause all merchandise coming or going by land or water between the residents of these opposite sections of the United

States to be forfeited, together with the vehicles conveying them. Obviously these regulations are sovereign in character, and essentially municipal and inland, and intended to be limited in operation to the territorial authority of the government over property within that authority, or in transit between places therein, with the exception of vessels and property made liable to seizure when found at sea. Section 6. The enactment in the sixth section, however read, cannot be understood simply as a municipal regulation, but is one also connected with a state of war with rebels, and in that sense is capable of being carried into effect also by the prize court, because extending to seizures at sea. The decision in Rose v. Himely, 4 Cranch [8 U. S.] 241, left that proposition unsettled by the court (Id. 281); a majority of the court reserving their opinion on the point whether a seizure of property on the high seas, under a municipal forfeiture, is invalid provided the property seized be immediately proceeded against regularly by the country in which the capturing vessel belongs. See, also, the opinion of Johnson, J., dissenting, in the main case, and his judgment in the circuit court in the same case (4 Cranch [8 U. S.] Append., 509), and the opinion of Chief Justice Tilghman, delivering the judgment of the court in Cheriot v. Foussat, 3 Bin. 220-254. The prize courts of Great Britain condemn property of its own subjects, being belligerents, whenever taken in a trade prohibited by the law of England. Wheat. Mar. Capt. 225. And the English government sanctioned as lawful a capture at sea by a Russian ship-of-war of an English merchant vessel which was attempting to violate a municipal law of Russia. The Vixen, 1 Dod. 136; (A. D. 1857) 54 Parliamentary Blue Book.

In opinion of the court in Rose v. Himely, 4 Cranch [8 U. S.] 272, delivered by Chief Justice Marshall, the doctrine is declared that a sovereign endeavoring to reduce revolted subjects to obedience possesses both sovereign and belligerent rights, and is capable of acting in either capacity, and that if, as legislator, he ordains a law imposing punishments for certain offences, which law is to be applied by courts, the nature of the law and the proceedings under it will determine whether it is an exercise of belligerent rights or exclusively of his sovereign power, as also whether the court, in applying this law to particular cases, acts as a prize court, or as a court enforcing municipal regulations. In the case of Hudson v. Guestier, 4 Cranch [8 U. S.] 293, the seizure, under like edicts, having been made by the parent government within the territorial jurisdiction of St. Domingo, but the property having been taken into a Spanish port, and tried and condemned in a French port, the court held that the French prize court had lawful jurisdiction, and that the condemnation could not be questioned in the United States courts. In my judgment, the act of July 13, 1861, is an exercise of the sovereign author-

ity of the government over its own citizens in insurrection and rebellion, and their property acquired and owned within the United States, and over those, also, remaining loyal to the constitution, and is not intended as a declaration or establishment of the belligerent rights or powers of the government in that respect; nor is the statute to be construed as revoking or impairing any war rights possessed by the government in that behalf under the law of nations. Instead of these municipal regulations overriding or rescinding the powers of the government under public law, the contrary consequence follows, in case of a conflict between a right to the forfeiture of property under municipal regulations and its confiscability under the jus gentium.

The brig Sally, an American vessel, was captured by a privateer, and condemned as lawful prize, in the Massachusetts district, for trading with the enemy. The United States intervened and claimed the vessel as forfeited to them under the provisions of the non-intercourse acts. The cause was taken by appeal to the supreme court. The court, in giving judgment, say that, by the general law of prize property engaged in an illegal intercourse with the enemy is deemed enemy property; that it is of no consequence whether it belongs to an ally or citizen; that the illegal traffic stamps it with the hostile character, and attaches to it all the penal consequences of enemy ownership; and that, in conformity with this rule, the property must be condemned to the captors. The claim interposed by the United States to the property, on the ground of an antecedent forfeiture to the United States because of a violation of the non-intercourse act of March 1, 1809, was disallowed. The court further say: "We are of opinion that this claim of the United States ought not to prevail. The municipal forfeiture under the non-intercourse act was absorbed in the more general operation of the law of war." The Sally, 8 Cranch [12 U. S.] 382.

I am of opinion, therefore, that no sound objection to the jurisdiction of the court in prize, in respect to the Aigburth, arises on the ground of the act of July 13, 1861. The jurisdiction clearly exists, as against both vessels and their cargoes, on general principles; and the Aigburth may be also amenable to condemnation under the sixth section of this act, or under the act of August 6, 1861, as property owned by inhabitants of the Confederate States, commercially domiciled there, or as property acquired and used, after the passage of the last act, for the purpose of aiding or promoting the insurrection in the Confederate States. The statutory provisions may be acted on by the court directly, or the functions of the court as previously existing may be exercised to the same end; there being no incompatibility in enforcing the forfeiture through the powers of the court under its process in

prize, or in proceedings for condemnation on the instance side of the court, on motion of the district attorney, in the same suit. Act Aug. 6, 1861 (12 Stat. 319). In my judgment, therefore, the defences set up in the pleadings and on the proofs by the claimants in these suits are inadequate to their acquittal, and decrees of condemnation must pass in both cases against the vessels and their cargoes.

Other questions are also involved in both suits, which the court has been invoked to decide, in order that the United States, in case of appeal from these decrees, may have the opportunity of presenting to the courts above the entire grounds upon which the forfeitures are claimed in both actions.

It is insisted that both vessels were possessed of illegal documents, obtained from the enemy, giving them the privilege of making their voyages from the enemy's ports. These consist of custom house clearances in those ports, and permits to pass the fortifications or limits of the same, both granted by rebel authorities. These were not papers professing to clothe the vessel with any protection from arrest at sea. They were only permits to navigate within and from the waters of the enemy, and were not designed or taken as covers against the rights of the United States as a belligerent. The acceptance and use of an enemy's license, whether efficacious or not, is ordinarily regarded as illegal, and as subjecting the vessel using it to confiscation. The Aurora, 8 Cranch [12 U. S.] 203; The Fanny's Cargo, 9 Cranch [13 U. S.] 181; The Ariadne, 2 Wheat. [15 U. S.] 143. The passes so taken by these vessels import (as would the rebel flag) that they were rebel property, which might require explanatory proof (Wheat. Mar. Capt. 158) if their confiscability was placed on that charge; but the testimony as to their being such is fully made out on other proofs. Those documents were no way calculated to mislead or deceive the captors, and need not be regarded as illegal in the sense of clothing the vessels with false semblances, and composing of themselves justifiable cause of capture. They would only serve as protections against rebel cruisers, and would be valueless as means of safety if exhibited to any other power, the Confederate States not being acknowledged as a legal government.

Another charge affecting both vessels is, that they intentionally evaded the blockade imposed, at the time they sailed, on the ports of North Carolina. The proclamation of the president of April 27, 1861, declared that the ports of the states of Virginia and North Carolina would be put under blockade, in addition to the blockades ordered to be established, on the 19th of the same month, of the ports of South Carolina, Georgia, Florida, Alabama, Louisiana, Mississippi, and Texas. Commodore Pendergrast, by his proclamation of April 30, 1861, at Hampton Roads, gave notice that he possessed adequate forces to make such blockade efficient. The Sarah Starr left the port of Wilmington, North Carolina, for Liverpool, England, on the 3d of August, 1861, and was captured by the United States ship-of-war Wabash twenty-five or thirty miles out from the bar. She had been delayed leaving the port by a heavy gale of wind blowing off it for some days. It appears, from the proofs in preparatorio, that the master and some of the crew and one of the owners of the cargo on board knew, when the vessel sailed, that North Carolina was at war with the United States, and had heard a report current that the ports of North Carolina were under blockade at the time, but did not know the latter fact, or that United States vessels were stationed there to enforce a blockade.

It appears from the proofs in preparatorio, that the schooner Aigburth was captured on the 31st of August, 1861, by the United States ship-of-war Jamestown, about forty miles off Fernandina, east of the Florida coast, on a voyage from Matanzas, Cuba, to New Brunswick, Nova Scotia, which was in continuation of her voyage out from Newbern. The outward cargo of rice from Newbern, and the return cargo of molasses, laden on board at Matanzas, were the property of Gravely, the owner of the vessel. The vessel, when captured, was fifteen to eighteen miles further west, and nearer the Florida coast, than her true course. The master was engaged to sail the vessel from Newbern to Matanzas, and thence, with a cargo, to the United States or British provinces, on wages of ninety-five dollars a month and five per cent. upon the net proceeds. He knew that North Carolina was at war with the United States, but did not know Newbern was blockaded. But he was told by the British consul at Charleston, on the 22d or 24th of July, that he had that day received notice from one of the commodores of the United States that the port of Newbern was blockaded from the 13th of that month, and that he, the master. must get to sea by the 28th of that month; and he did get to sea the morning of the 28th.

These proofs manifest that on board of both vessels there was a clear notice that the ports of Wilmington and Newbern, at the respective times those vessels departed therefrom, were claimed by the United States to be held under blockade. The documents in evidence show that the blockade had been authoritatively imposed on the 30th of April upon those ports. The capture of the Sarah Starr, on the day of her departure (August 3) by a United States ship-of-war, is prima facie proof that she was empowered to enforce the blockade. It is, however, imperfect evidence of the fact that she was a force adequate to maintain the blockade, or was stationed there for that purpose; because the accompanying testimony shows that the capturing vessel was at the time moving past the port, en route for Hampton Roads. from Charleston, where she had been previously stationed.

There is no direct evidence that any vessel was at the time stationed off North Carolina in maintenance of the blockade of those ports. The proofs are that the Aigburth went out of the port of Newbern on the morning of the 28th of July, without any vessel being seen or known to be off that port supporting its blockade. There can be no doubt that it is incumbent on the United States to establish the fact that an adequate force was assigned and stationed off these ports at the time of the egress from them of the above-named vessels, so as to render the ingress or departure of the vessels to or from the ports dangerous. There need not be a closed cordon of vessels surrounding the places at all times, so as absolutely to command all approaches to the ports from without, or departure from them from within. The blockade must, however, be so sustained by competent forces as to render it efficient to all ordinary intent and apprehension. This, of course, admits of the accidental absence of blockading vessels, from stress of weather or other contingencies, and will also dispense with the employment of the more active and rapid services of steam vessels in such accumulation of watchful forces as is sometimes exacted when ships moved by canvas only are used. What the law demands is the allotment and stationing of that amount of force for the service which shall render it physically hazardous for other craft to evade the blockade. To that end the blockading forces must be such as to constitute an actual investment of the place blockaded. The English and American cases concur in all essentials as to the lawful constituents of a blockade in modern times, and the manner in which it shall be enforced. 1 Kent, Comm. 144–161; 3 Phillim. Int. Law, p. 387, art. 294; The Nornen, Spinks, Prize Cas. 171; The Franciska, Id. 111. A cluster of suits were embraced within one decision in the last case. The doctrines of blockade were largely discussed by the court. It is stated, in a note, that the general decision was reversed on appeal; but it does not appear on what points. The case is, however, instructive as to the general application of the law of blockade.

The testimony upon the preparatory interrogatories is very full and positive that no vessels-of-war were placed off those ports, within view or knowledge of these vessels, when either of them came out; and it is made equivocal whether the blockade was actually set on foot fifteen days before the egress of either of them from the ports. It is made sufficiently certain, upon the proofs, that notice of the blockade had reached both vessels previous to their sailing from the ports. In this state of the case it is incumbent on the libellants to give evidence of the time the blockade was actually imposed, and that it was made efficient by forces stationed there adequate to prevent vessels from going in or leaving without the knowledge and interposition of the blockading force to prevent it. Although the evidence raises a suspicion that the Aigburth might be seeking an opportunity to enter a blockaded port, yet it is not sufficiently direct and impressive to justify her condemnation on that proof alone.

The usage in the United States courts of prize is to allow further proof to be given by either party upon reasonable cause appearing in the progress of the suit for its reception, or on such cause being afterwards shown; and, in the English practice, the libellants are allowed, of course, to put in all cases when the claimants elect to proceed, on their part, by plea and proof. The Maria, Spinks, Prize Cas. 321. Here the claimants make full defence on the record by their claims and answers, and would, in that manner, fall within the rule. A certificate from the navy department furnished in another suit, of the allotment of vessels to the maintenance of the blockade of the North Carolina ports, was offered in evidence by the libellants, to be applied in this trial; but, not being assented to by the advocate for the claimants, it cannot be considered as legally in evidence in these suits.

Upon the points of the efficiency of the blockade, and the time it was set on foot by the government, and of the supposed attempt of the Aigburth, at the time of her capture, to violate the blockade, the libellants are allowed to furnish further proofs on giving ten days' previous notice to the proctor for the claimants. Upon the other points in issue and litigation between the parties, it is ordered, first, that a judgment and decree be entered, declaring that the brig Sarah Starr and her cargo were both, at the time of their capture, enemy property, and subject to condemnation and forfeiture to the libellants as such; second, that the schooner Aigburth and her cargo, at the time of her capture, were both enemy property, and subject to condemnation and forfeiture to the United States as such, and that they be so declared and adjudged; and, third, that the masters and owners of both vessels, and of their cargoes, had notice and knowledge, at the time of their egress from the ports of North Carolina, that those ports were in a state of blockade by the ships-of-war of the United States; but it does not appear by the proofs that such blockade was efficiently supported and enforced on the part of the government; nor does it appear that actual notice thereof was given to those vessels, or that it was imposed fifteen days prior to the departure of the said vessels from those ports; nor does it appear that the said schooner Aigburth was, when captured, attempting to violate any blockade of ports on the coast, set on foot by the proclamations of the president of the United States; and, accordingly, as to these three points, the libellants are allowed, as above directed, to give further proofs.

If no further proofs are offered, pursuant to the terms above mentioned, then a final decree is to be entered in favor of the libel-

lants for the condemnation and forfeiture of both of the aforesaid vessels and their cargoes as enemy property, and in favor of the claimants, acquitting the said vessels of the charge of having violated the blockade aforesaid in leaving the said ports, and the schooner Aigburth of attempting a violation of such blockade at the time of her capture.

NOTE. In the case of The Sarah Starr the circuit court, on appeal, July 17, 1863, affirmed this decree as to the vessel and the cargo claimed by Evans, and reversed it as to the cargo claimed by the Munros. [Case No. 12,353.] A further appeal to the supreme court was taken by the claimant of the vessel, but none as to the cargo. [Unreported.] In the case of The Aigburth this decree was affirmed by the circuit court, on appeal, July 17, 1863. [Case No. 106].

[For opinion on question of marshal's fees after bonding for appeal, see Case No. 105.]